330 P.3d 996

STATE of Arizona ex rel. Henry R. DAR-WIN, Director of Environmental Quality, Plaintiff/Appellee,

v.

William W. ARNETT and Jane Doe Arnett, husband and wife, Defendant/Appellant.

No. 1 CA–CV 13–0420.

Court of Appeals of Arizona, Division 1.

July 22, 2014.

Arizona Attorney General's Office, By Jeffrey D. Cantrell and Louise Erickson, Phoenix, Counsel for Plaintiff/Appellee.

Baird Williams & Greer, LLP, By Robert L. Greer, Phoenix, Counsel for Defendant/Appellant.

Judge KENT E. CATTANI delivered the opinion of the Court, in which Presiding Judge PATRICIA K. NORRIS and Judge SAMUEL A. THUMMA joined.

## OPINION

CATTANI, Judge.

¶ 1 This is an appeal from a superior court judgment in favor of the Arizona Department of Environmental Quality ("ADEQ") against an individual who owned an underground storage tank ("UST") that leaked gasoline. ADEQ previously obtained a remediation consent decree against the company that operated the UST, but after the company filed for bankruptcy, ADEQ learned that the company did not own the UST and therefore pursued remediation remedies against the UST owner. We conclude that the superior court properly rejected, among other arguments, the UST owner's assertion that principles of res judicata barred ADEQ's claims. Accordingly, and for reasons that follow, we affirm the superior court's judgment.

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 The relevant facts are essentially undisputed. In February 1981, a 12,000 gallon UST was installed at a property in Tucson under a permit for "Yellow Cab." In 1982,

William Arnett purchased the site, together with the name "Yellow Cab" and other assets from a company in bankruptcy.[1] Shortly thereafter, Arnett recorded a deed reflecting the ownership change with the Pima County Recorder.

¶ 3 In April 1982, Arnett incorporated Yellow Cab Company of Tucson, Inc. ("Yellow Cab") as a subsidiary of Arizona Checker Leasing, which Arnett owned. Arnett leased the real property and the UST to Yellow Cab, which operated the taxi facility.

¶ 4 In October and November 1988, the UST leaked gasoline and failed two tank tightness tests. Neither Arnett nor Yellow Cab notified ADEQ of a suspected leak within 24 hours of obtaining the results, as required under Arizona Revised Statutes ("A.R.S.") section 49–1004(A).[2]

¶ 5 On February 14, 1990, the Tucson Fire Department inspected the UST and ordered Yellow Cab to empty it, assess the extent of contamination, and remediate any unauthorized discharges. On February 23, 1990, Arnett reported the failed testing results to ADEQ, listing Yellow Cab as the responsible party.

¶ 6 In March 1990, Yellow Cab submitted to ADEQ a Notification for Underground Storage Tanks form, which reported Yellow Cab as the owner of the UST. That same month, Yellow Cab had the UST removed.

¶ 7 In September 1990, ADEQ received a Site Characterization Report prepared on behalf of Yellow Cab stating that "[t]he site is currently operated and owned by Yellow Cab," and in November 1991, ADEQ issued a letter of warning to "William Arnett/Yellow Cab Company" detailing statutory violations and specifying a deadline by which Yellow Cab was to provide a corrective action plan.

¶ 8 In April 1992, Yellow Cab submitted a corrective action plan. The plan did not suggest that anyone other than Yellow Cab owned the UST, and implicitly confirmed Yellow Cab's responsibility for the leak.

¶ 9 In May 1993, ADEQ issued a compliance order to Yellow Cab that included a statement that ADEQ had received a notification form identifying Yellow Cab as the owner and operator of the UST. Yellow Cab requested a hearing, again without identifying a different owner of the UST.

¶ 10 In December 1993, ADEQ and Yellow Cab entered into a consent order, which required Yellow Cab to perform specific actions pursuant to a compliance schedule. The consent order stated that Yellow Cab owned and operated the facility, and expressly reserved ADEQ's right to require further action "[i]f additional information is discovered which indicates that the actions taken under this Consent Order are or will be inadequate to protect the public health, welfare, or the environment, or to conform with applicable federal or state laws." Arnett signed the December 1993 consent order on behalf of Yellow Cab.

¶ 11 ADEQ subsequently filed a complaint alleging that Yellow Cab had violated the consent order. In July 1995, the superior court issued a consent decree, which included a statement that Yellow Cab owned the UST. Arnett signed this consent decree on behalf of Yellow Cab, affirming his agreement with the provisions in the decree, including $507,750 in stipulated penalties.

¶ 12 In March 2001, ADEQ sent Yellow Cab a demand letter seeking the penalty payment required under the consent decree. Yellow Cab did not pay the penalty, and in April 2003, filed for bankruptcy. In March 2004, the Arizona Corporation Commission administratively dissolved Yellow Cab.

¶ 13 When deposing Arnett in the Yellow Cab bankruptcy proceedings in February 2005, ADEQ learned that Arnett personally owned the UST, as well as the land that had been contaminated by the UST leak.

¶ 14 In September 2010, ADEQ sued Arnett for the cost of cleanup and for civil penalties. Arnett answered and filed a third party complaint naming a party to whom he had sold the property in April 2007.

---

**1.** Arnett purchased the property with his wife, who passed away in 2004 and is not a party to this action.

**2.** Absent material revisions after the relevant date, we cite the current version of the statute.

¶ 15 Following discovery, Arnett asserted res judicata and various equitable defenses. Arnett requested a jury trial, which the superior court denied. The court bifurcated the trial on the issues of liability and damages, and after a bench trial, found Arnett liable for remediation expenses and penalties. The court rejected Arnett's res judicata defense, finding that Arnett had negligently misrepresented that Yellow Cab owned the UST, and that ADEQ reasonably relied on the misrepresentation. Thus, under principles of res judicata, ADEQ's failure to name Arnett as a party in the suit that resulted in the 1995 consent decree against Yellow Cab did not preclude ADEQ's claims against Arnett in this case.

¶ 16 The court entered judgment against Arnett in June 2013, and Arnett timely appealed. We have jurisdiction under Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 12–120.21(A)(1) and –2101(A)(1).

## DISCUSSION

¶ 17 Arnett argues the superior court erred by (1) rejecting his res judicata defense, (2) rejecting his laches defense, and (3) denying his right to a jury trial. We address each issue in turn.

## I. Res Judicata.

■■■■ ¶ 18 Arnett asserts that res judicata barred the instant litigation because ADEQ's claims against him could have been pursued in the previous litigation against Yellow Cab. When a judgment on the merits in one lawsuit involves the same parties or their privies as a subsequent lawsuit, res judicata bars assertion of the same cause of action in the subsequent lawsuit. *Stearns v. Ariz. Dep't of Revenue*, 231 Ariz. 172, 177, ¶ 25, 291 P.3d 369, 374 (App.2012). We review this issue de novo, *see id.* at ¶ 24, and, like the superior court, conclude that Arnett's argument fails because his misrepresentations regarding ownership of the UST resulted in ADEQ not pursing claims against him in the prior proceeding.

## A. Misrepresentation Exception.

■■■ ¶ 19 Comment j to § 26 of the Restatement (Second) of Judgments (1982) recognizes an exception to res judicata if the party asserting it made misrepresentations—including innocent misrepresentations—that prevented the other party from asserting claims that could have been pursued in the prior proceeding:

A defendant cannot justly object to being sued on a part or phase of a claim that the plaintiff failed to include in an earlier action because of the defendant's own fraud....

The result is the same when the defendant was not fraudulent, but by an innocent misrepresentation prevented the plaintiff from including the entire claim in the original action.

The result is different, however, where the failure of the plaintiff to include the entire claim in the original action was due to a mistake, not caused by the defendant's fraud or innocent misrepresentation.

¶ 20 Applying this provision of the Restatement, the superior court made the following findings:

47. The Consent Decree states that Yellow Cab "was the owner of an underground storage tank ... from which a release, as defined in A.R.S. § 49–1001(14)[sic] occurred."

. . . .

49. In the Consent Decree, Mr. Arnett represented that he "agrees with the statements" made in it.

50. This constituted a representation that Yellow Cab owned the UST.

51. At the time he signed the Consent Decree, Mr. Arnett knew that he and his wife, not Yellow Cab, owned the Property and the UST.

52. Mr. Arnett failed to disclose this fact to ADEQ.

53. At the time the Consent Decree was entered into, ADEQ did not know that Mr. Arnett and his wife owned the UST.

. . . .

59. ... [A]t no time before the Consent Decree was entered, or for several years

afterwards, did Mr. Arnett or anyone representing him inform ADEQ directly that the Consent Decree wrongly named Yellow Cab as the owner of the UST.

¶ 21 Arnett argues that Yellow Cab's claim of ownership was not a misrepresentation under A.R.S. § 49–1001.01(A), which defines a UST owner as someone who "[h]olds a legal, equitable, or possessory interest of any kind in an underground storage tank." But this definition was not in effect at the time the consent decree issued in July 1995. As relevant here, the applicable statute at the time defined a UST owner as "a person who owns an underground storage tank or a person who owned an underground storage tank immediately before the underground storage tank was taken out of operation." A.R.S. § 49–1001.01(A) (1995). Thus, Arnett, rather than Yellow Cab, should have been identified as the UST owner.

¶ 22 Arnett argues that the 1997 amendment to § 49–1001.01, which enacted the current definition of UST ownership, should be applied because the amended definition simply clarified the prior definition. *See* S. Fact Sheet (Mar. 13, 1997), S.B. 1331, 43d Leg., 1st Reg. Sess. (Ariz.1997) ("Clarif[ying] that an 'owner' is a person who holds a legal, equitable or possessory interest in a UST, or held at the time of a release, or immediately before the underground storage tank (UST) was taken out of operation, a legal, equitable or possessory interest in the tank."). But even this statement in the Senate Fact Sheet was captioned as "Changes to the Definition of 'Owner,' " *id.*, and the 1997 revision in fact changed the definition by expanding it to include not only persons who own a UST, but also persons with an equitable or possessory interest in a UST. *See* 1997 Ariz. Sess. Laws, ch. 167, § 2 (S.B.1331). Moreover, even under the 1997 definition, Arnett's representations to ADEQ regarding ownership were at best incomplete because, under that definition, both Yellow Cab (as the site operator) *and* Arnett (as the UST owner) should have been listed. Yet, Arnett, on behalf of Yellow Cab, only listed Yellow Cab as the owner.

¶ 23 Furthermore, other communications from Arnett to ADEQ were similarly inaccurate. Arizona UST owners are required to notify ADEQ in writing of "the tank's age, size, type, location and use." A.R.S. § 49–1002(A); *see also* Ariz. Admin. Code ("A.A.C.") R18–12–222. The applicable regulations provide that "[a]n owner shall submit the most current and complete information on each UST system at each facility utilizing the [ADEQ] form titled 'Notification for Underground Storage Tanks.' " A.A.C. R18–12–222(B). In submitting the notification form, Arnett incorrectly indicated that Yellow Cab owned the UST, and he neglected to inform ADEQ that he was the actual owner even after the compliance order, consent order, and consent decree were issued to Yellow Cab as the UST owner. Thus, the superior court did not err by finding that Arnett misrepresented who owned the UST.

**B. Recorded Deed.**

¶ 24 Arnett asserts that the deed recorded after he purchased the land on which the UST was located provided constructive notice of his ownership of the UST under A.R.S. § 33–416, and that ADEQ had a duty to investigate ownership of the UST notwithstanding Arnett's representation that Yellow Cab owned the UST. Arnett's assertion is unpersuasive, however, because the recorded deed did not address who owned the UST.

¶ 25 Under A.R.S. § 33–416, a recorded deed "shall be notice to all persons of the existence of such grant, deed or instrument." A recorded deed provides constructive notice "to those who are bound to search for it." *Lowe v. Pima County*, 217 Ariz. 642, 647, ¶ 21, 177 P.3d 1214, 1219 (App.2008) (citation omitted).

¶ 26 Arnett's recorded deed gave notice as to Arnett's ownership rights in real property described as "Lots 9 to 16, inclusive, Block 69, CITY OF TUCSON, according to Book 3 of Maps, page 70, and according to Book 1 of Maps, page 7, records of Pima County, Arizona." Even assuming ADEQ was obligated to search for the deed, ADEQ provided evidence that constructive notice of land ownership does not equate to constructive notice of UST ownership. ADEQ staff testified that in a significant percentage of remediation cases, USTs are owned by someone other

than the land owner. Section 33–416 does not address UST ownership, and Arnett's recorded deed did not preclude ADEQ from relying on Arnett's representations of UST ownership (actual notice) as part of the state's self-reporting UST program. Accordingly, the superior court properly concluded that the recorded deed did not provide constructive notice of Arnett's UST ownership.

### C. ADEQ's Reliance on Self–Reported Information.

¶ 27 Arnett further argues ADEQ did not exercise due diligence because it relied on Arnett's self-reported information without following its standard protocol for determining who owned the UST. But ADEQ in fact followed its standard protocol.

¶ 28 An ADEQ staff member testified that ADEQ investigates UST ownership following a leak if (1) the identity of the owner is unknown, (2) the entity previously identified as the owner disputes ownership, or (3) there is evidence of multiple owners. The ADEQ staff member testified that the UST program is designed to be self-reporting because there are approximately 28,000 regulated USTs in Arizona, and state resources are limited.

¶ 29 In the instant case, in March 1990, Yellow Cab self-reported that it was the owner of the UST, and Arnett, as president of Yellow Cab, verified that representation. And neither Yellow Cab nor Arnett disputed Yellow Cab's ownership of the UST or suggested that someone else owned the UST. Thus, Arnett has not established that ADEQ did not follow its own protocol or was otherwise dilatory by not learning that Arnett owned the UST until deposing him in the Yellow Cab bankruptcy proceedings.

¶ 30 Arnett argues that under the reasoning in *Harnett v. Billman*, 800 F.2d 1308 (4th Cir.1986), the Restatement misrepresentation exception should not be applied here. In *Harnett*, a minority corporate shareholder pursued litigation in federal court against majority shareholders, asserting fraud and securities fraud claims. *Id.* at 1310–11. Pursuant to a settlement agreement that permitted the plaintiff to pursue other state court claims, the court dismissed the case with prejudice. *Id.* at 1311. In a subsequent lawsuit, the plaintiff again asserted certain fraud claims, arguing these claims were not precluded by res judicata because alleged misrepresentations by the majority shareholders had prevented him from discovering the basis for the claims. *Id.* at 1311, 1313–14. The Fourth Circuit rejected the plaintiff's request to apply the misrepresentation exception, however, because during discovery in the first lawsuit, the plaintiff had received unambiguous evidence of the alleged fraud and concealment, and the defendants' alleged misrepresentations thus did not excuse the plaintiff's failure to raise the claims in the prior litigation. *Id.* at 1313–14. Here, in contrast, ADEQ was not aware that Arnett had misrepresented who owned the leaking UST before ADEQ entered into a consent order and decree with Yellow Cab.

¶ 31 Arnett's reliance on *Cummins, Inc. v. TAS Distributing Co.*, 676 F.Supp.2d 701 (C.D.Ill.2009), is similarly misplaced. In *Cummins*, the court observed that the Restatement exception "applies only if the misrepresentation *caused* the other party's failure to include the claim in the earlier case," and if the party seeking to avoid res judicata could not have realized that it had a claim. *Id.* at 716. In this case, by failing to notify ADEQ of his ownership interest and by affirmatively representing that Yellow Cab owned the UST, Arnett led ADEQ to enter into the 1995 consent decree with Yellow Cab. ADEQ was entitled to rely on Yellow Cab's self-reported information under A.R.S. §§ 49–1001 to –1093, and the court did not err by applying the misrepresentation exception to res judicata in this case.[3]

### II. Laches.

¶ 32 Arnett asserts that equitable remedies, including laches, should have been

---

3. Arnett also argues that ADEQ was required to pursue setting aside the consent decree involving Yellow Cab by seeking relief from judgment under Rule 60 of the Arizona Rules of Civil Procedure. But ADEQ was not required to re-open the consent decree to pursue statutory remedies against another responsible party, and Arnett himself used the consent decree as a defense. Thus, Arnett's reliance on Rule 60 procedures is misplaced.

applied to bar ADEQ's lawsuit because of ADEQ's delay in pursuing claims against him. This court reviews a superior court's decision concerning laches for an abuse of discretion. *McLaughlin v. Bennett*, 225 Ariz. 351, 353, ¶ 5, 238 P.3d 619, 621 (2010). Generally, laches will "bar a claim when the delay [in filing suit] is unreasonable and results in prejudice to the opposing party." *League of Ariz. Cities & Towns v. Martin*, 219 Ariz. 556, 558, ¶ 6, 201 P.3d 517, 519 (2009) (alteration in original) (citing *Sotomayor v. Burns*, 199 Ariz. 81, 83, ¶ 6, 13 P.3d 1198, 1200 (2000)). Delay alone, however, is not sufficient to establish a laches defense. *Id.*

¶ 33 Under A.R.S. § 12–510, statutes of limitations do not run against the State for actions involving UST statutory violations under A.R.S. §§ 49–1001 to –1093. And the doctrine of laches does not apply against the State or its agencies in matters affecting the public interest absent a statute expressly allowing such a defense. *Mohave County v. Mohave–Kingman Estates, Inc.*, 120 Ariz. 417, 421, 586 P.2d 978, 982 (1978); *State ex rel. Sullivan v. Moore*, 49 Ariz. 51, 62, 64 P.2d 809, 814 (1937). Here, in enacting the UST statutes, the Arizona Legislature found that the "environment and health of the people of this state are endangered by the release into the surface water, groundwater and subsurface soils of this state of regulated substances from underground storage tanks." 1986 Ariz. Sess. Laws, ch. 230, § 1.

¶ 34 Arnett cites to several instances in which courts have applied laches or equitable estoppel in cases in which a governmental agency is a party. But in those cases, the governmental entity made misrepresentations (or actions inconsistent with the entity's later position) on which the opposing party relied, a factor not present here. *See Valencia Energy Co. v. Ariz. Dep't of Revenue*, 191 Ariz. 565, 582, ¶ 55, 959 P.2d 1256, 1273 (1998); *Gorman v. Pima County*, 230 Ariz. 506, 510–13, ¶¶ 21–27, 287 P.3d 800, 804–07 (App.2012).

¶ 35 Because the statute of limitations does not apply to this type of litigation, and because applying laches to bar ADEQ's action in the instant case would adversely affect ADEQ's ability to regulate USTs and would harm the public's interest in safe water, the superior court properly rejected Arnett's laches defense. *See Mohave–Kingman Estates*, 120 Ariz. at 421, 586 P.2d at 982; *Valencia Energy*, 191 Ariz. at 581, ¶ 54, 959 P.2d at 1272.

### III. Right to Jury Trial.

¶ 36 A defendant's right to a jury trial is a question of law that this court reviews de novo. *Stoudamire v. Simon*, 213 Ariz. 296, 297, ¶ 3, 141 P.3d 776, 777 (App. 2006). Article 2, Section 23, of the Arizona Constitution preserves the right to a jury trial if the right existed prior to statehood. *See Smith v. Ariz. Citizens Clean Elections Comm'n*, 212 Ariz. 407, 416, ¶ 43, 132 P.3d 1187, 1196 (2006) (citing *Derendal v. Griffith*, 209 Ariz. 416, 419, ¶ 8, 104 P.3d 147, 150 (2005)). Unless expressly provided for by statute, "there is no right to a jury trial on statutory claims that did not exist at common law prior to statehood." *See In re Estate of Newman*, 219 Ariz. 260, 272, ¶ 45, 196 P.3d 863, 875 (App.2008).

¶ 37 Here, ADEQ sued Arnett for civil penalties, remediation costs, and other relief based on violations of UST rules and regulations under A.R.S. Title 49, Chapter 6. These statutory claims did not exist prior to statehood, *see* 1986 Ariz. Sess. Laws, ch. 230, § 2 (creating original UST regulations), and Title 49, Chapter 6, does not provide a right to a jury trial for such actions. *See, e.g.,* A.R.S. § 49–1013(H) (authorizing ADEQ to "file an action in the superior court to enforce this chapter and to collect penalties for violations of this chapter," but making no mention of a right to a jury trial). Accordingly, the superior court did not err by denying Arnett's request for a jury trial.

### IV. Attorney's Fees.

¶ 38 Arnett has requested attorney's fees under A.R.S. § 12–348(A). As Arnett is not the prevailing party on appeal, we deny his request for attorney's fees.

### CONCLUSION

¶ 39 For the foregoing reasons, we affirm

the superior court's judgment.[4]

**4.** We modify the caption to reflect automatic substitution of Henry R. Darwin, now Director of ADEQ, as a named party. *See* ARCAP 27(c). ?